IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Martin Louis Ballard, | ) | |
| | ) | Cr. No. 2:12-0232 |
| Movant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Movant Martin Louis Ballard is an inmate in custody of the Federal Bureau of Prisons (BOP) who currently is housed at USP-Lee in Pennington Gap, Virginia. This matter is before the court on Movant's motion to vacate, set aside, or correct a sentence under 28 U.S.C. § 2255, which motion was filed by counsel on September 30, 2019.

## I. FACTS AND PROCEDURAL BACKGROUND

This case involved a large-scale drug conspiracy in the Walterboro, South Carolina, area. Movant supplied cocaine to a co-defendant, Ivory Brothers, during the 2008-2012 time period. In January 2012, law enforcement approached Brothers and secured his cooperation. An indictment naming sixteen defendants, including Movant and Brothers, was filed on March 14, 2012. Movant was arrested on March 19, 2012 as he was driving away from his residence. A search of his vehicle revealed a loaded Taurus 9mm semi-automatic pistol in the center console, one gram of cocaine, eleven cell phones, in excess of one thousand dollars in cash, and a spent 9mm shell casing. A search of Movant's residence revealed a cocaine press, various financial documents, and a number of cell phones.

Brothers and twelve other co-defendants were arrested on March 21, 2012. Other arrests took

place on March 20, 2012 and March 22, 2012.  Brothers was released on a $50,000.00 secured bond on March 26, 2012.[1]  When discovery became available that revealed Brothers' cooperation, Movant orchestrated a "hit" on Brothers.  To this end, Movant recruited defendants Charles Anthony Sanders, Jimmie Harris, Anthony Terrance Jerry Davis, and Garrick Isaiah Sanders to carry out the murder.  On June 6, 2013, at the direction of Movant, Davis contacted Charles Sanders to pick up Harris in North Charleston, South Carolina, and drive him to  Walterboro to carry out the shooting.  Brothers was visiting a cousin when Charles Sanders and Harris drove up.  Harris shot through the glass front door and shot Brothers between seven and ten times in the neck, chest, abdomen, and thigh.  Brothers survived his injuries.

A fourth superseding indictment charged Movant, Brothers, Charles Sanders, Harris, Davis, and Garrick Sanders of conspiracy to possess with intent to distribute and distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846 (Count 1).  Count 1 of the indictment attributed to each of Movant and Brothers 5 kilograms or more of cocaine and 280 grams or more of cocaine base.  Count 1 further charged Ballard, Charles Sanders, Harris Davis, and Garrick Sanders with certain overt acts set forth in Counts 4, 5, 6, 7, 8, 9, and 10 in furtherance of the conspiracy.  The fourth superseding indictment charged Movant with using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count 2); possession with intent to distribute a quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) (Count 3); using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a drug trafficking crime, in violation of 18

---

[1] Movant was released on a $250,000.00 secured bond on May 14, 2012; however, his bond was revoked on September 14, 2012.

U.S.C. § 924(c)(1)(A)(i) (Count 4); and solicitation of murder for hire, in violation of 18 U.S.C. § 373 (Count 7). In addition, the fourth superseding indictment charged Movant and four co-defendants with conspiracy to use interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958(a) (Count 5); use of interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. §§ 1958 and 2 (Count 6); obstruction of justice, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2 (Count 8); obstruction of justice, in violation of 18 U.S.C. §§ 1513(a)(1)(B) and 2 (Count 9); conspiracy to use and carry firearms during and in relation to, and to possess firearms in furtherance of, drug trafficking crimes and crimes of violence, in violation of 18 U.S.C. § 924(o) (Count 10); and using and carrying a firearm during and in relation to, and to possessed a firearm in furtherance of, drug trafficking crimes and crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and 2 (Count 11).

On April 13, 2015, Movant, through trial counsel, moved for a bench trial rather than a jury trial. The Honorable Sol Blatt, Jr. held a hearing on Movant's motion on April 17, 2015. Judge Blatt queried Movant under oath regarding the waiver of his right to a jury trial and whether he had discussed the waiver in detail with trial counsel. ECF No. 1961, 4-6. Movant stated that he had discussed the advantages and disadvantages of a jury trial as against a bench trial with trial counsel. Movant further stated that he understood if he went forward with a bench trial, it would be before Judge Blatt, and that Judge Blatt would sentence him. Id. at 6-7. Trial counsel informed Judge Blatt that he and Movant had discussed the prospect of a bench trial over the past few weeks and that Movant had freely made the decision to request a bench trial. Both trial counsel and the government consented to a bench trial. Id. at 11. Accordingly, Judge Blatt granted Movant's motion and set a bench trial to commence on May 5, 2015. The bench trial concluded on May 18, 2015. On May 19,

2015, Judge Blatt found Defendant guilty as to Count 1; guilty of the lesser included offense of possessing a quantity of cocaine as to Count 3; not guilty as to Count 4; and guilty as charged as to Counts 5-11. The government did not proceed with Count 2, and Judge Blatt dismissed that charge. The matter was reassigned to the undersigned on June 29, 2016, after Judge Blatt's passing on April 20, 2016.

Movant was sentenced on October 18, 2016, to custody of the BOP for a total term of life plus 10 years, consisting of life as to Count 1; 12 months as to Count 3; 240 months as to Counts 5, 6, 7, and 10; and 360 months as to Counts 8 and 9; all to run concurrently; and 120 months as to Count 11, to run consecutively to all other counts. Judgment was entered on October 20, 2016. The Court of Appeals for the Fourth Circuit affirmed the conviction and sentence on March 15, 2018.

Movant asserts the following ground for relief in his § 2255 motion:

GROUND ONE: The trial judge as the fact finder should have disqualified himself as he heard the guilty pleas of several witnesses in Mr. Ballard's case. He had passed upon their credibility in accepting the pleas.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The Honorable Sol Blatt, Jr. tried the case as a bench trial. Prior to the trial of this case, Judge Blatt had taken guilty pleas from six of the witnesses in the case against Mr. Ballard. In each of the pleas, the defendant was sworn. The witnesses and the date and docket entry of their plea are as follows:
1. Norman Robinson - 9/11/2014  docket entry 1204
2. Steven Mosley - 1/27/2014 docket entry 865
3. Charles Youmans - 3/5/ 2014 docket entry 913
4. Jimmie Harris - 3/31/2015 docket entry 1429
5. Garrick Sanders - 3/17/15 docket entry 1411 (as this entry is sealed the assumption is this was the plea date)
6. Charles Sanders - 3-24-15 docket entry 1454
The transcript of the plea of Jimmie Harris is found at docket entry 1444 and of Charles Sanders at 1454.
In accepting the plea each defendant would have to admit their involvement in either

4

the drug conspiracy or the shooting.  In both Mr. Harris' plea and Mr. Sanders' plea, the involvement of Mr. Ballard in the shooting was acknowledged by each defendant. Judge Blatt was required to find the witness was truthful in order to accept the plea. Thus, prior to the trial of this case, Judge Blatt had passed upon the credibility of each witness who entered a guilty plea.  He had found them credible and therefore the involvement of Mr. Ballard as being credible.  As such, Judge Blatt could not be an objective fact finder and should have disqualified himself on his own motion.

GROUND TWO:  Trial counsel failed to inform Martin L. Ballard that Judge Sol Blatt, Jr. had taken the guilty pleas of six witnesses testifying against Mr. Ballard. He had, therefore, passed upon their credibility under oath as to many of the facts against Mr. Ballard.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

After conferring with his counsel, Mr. Ballard elected to proceed with a bench trial in this case.  In making this decision, trial counsel failed to inform Mr. Ballard that Judge Sol Blatt, Jr. had heard the guilty pleas of six of the witnesses again[s]t him. At each plea, the defendant would have been placed under oath and asked if the facts provided by the government are true.  Judge Blatt could not have accepted the guilty plea if he did not believe the various defendants were being truthful.  Thus, trial counsel failed to inform Mr. Ballard of these facts and therefore the decision by Mr. Ballard to proceed with a bench trial was not a decision made with knowledge of all the facts.  In addition, Judge Blatt should have also advised Mr. Ballard of the fact that the judge had passed upon the credibility of many of the witnesses against Mr. Ballard and asked if Mr. Ballard were willing to waive the conflict.  If asked, Mr. Ballard would not have waived the conflict  In add[i]tion, Judge Blatt took the plea of Mr. Harris in [which] he ack[now]ledged Mr. Ballard's alleged involvement in the crime.  At the trial Mr. Harris decline to testify.  Had Mr. Ballard understood that Mr. Harris admitted his alleged involvement under oath before Judge Blatt, he would not have elected to have [Judge] Blatt be the fact finder in the case.

ECF No. 1908, 5-6.

The government filed a motion to dismiss on July 25, 2020, to which Movant filed a response on September 30, 2020.

5

## II. DISCUSSION

A.     Ground One

The scope of a § 2255 collateral attack is narrower than an appeal, and a "'collateral challenge may not do service for an appeal.'" <u>Foster v. Chatman</u>, 136 S. Ct. 1737, 1758 (2016) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 165 1584 (1982)).   In this case, Movant could have raised his claim on direct appeal that Judge Blatt should have recused himself from presiding over the bench trial.  The failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless the petitioner can demonstrate cause and prejudice, or actual innocence.  <u>United States v. Pettiford</u>, 612 F.3d 270, 280 (4th Cir. 2010).  Movant has made no argument that he was prevented from raising Ground One on direct appeal.  Accordingly, the court will review Movant's § 2255 motion only as to his ineffective assistance of counsel claim.

B.     Ground Two

To prove ineffective assistance of counsel, Movant must show that trial counsel's performance was deficient. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient when it is not reasonable under prevailing professional norms.  <u>Id.</u> at 688.  Movant also must demonstrate that he was prejudiced by trial counsel's alleged deficient performance, in that because of trial counsel's unprofessional errors, the result of the proceeding would have been different.  <u>See</u> <u>id.</u> at 694.  <u>Strickland</u> requires Movant to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." <u>Id.</u> at 690.  The court then must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."

Id. Even if counsel's performance is outside the wide range of professional assistance, an error by counsel will not warrant setting aside the conviction if the error had no effect on the judgment. Id. at 694.

Movant contends trial counsel was ineffective for failing to inform Movant that Judge Blatt had presided over the change of plea hearings for six witnesses who testified against Movant at trial. Movant contends that, in accepting the guilty pleas, Judge Blatt passed upon the credibility of these defendants who later testified against Movant. According to Movant, his decision to waive his right to a jury trial was not knowing and voluntary and that, had trial counsel informed him that Judge Blatt presided over the guilty pleas, he would not have elected to have Judge Blatt serve as the factfinder. Movant contends he was prejudiced because Harris declined to testify at the trial, but Judge Blatt, having taken Harris's guilty plea, was privy to Harris's damaging testimony that was not presented at trial.

Fed. R. Crim. P. 23(a) provides that a criminal defendant is entitled to a jury trial, and the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves. The Sixth Amendment requires that the waiver must be knowing, intelligent, and voluntary. United States v. Boynes, 515 F.3d 284, 286 (4th Cir. 2008) (citing Patton v. United States, 281 U.S. 276, 312-13 (1930), overruled on other grounds by Williams v. Florida, 399 U.S. 78, 92 (1970)).

In Boynes, the defendant and his attorney discussed defendant's desire to waive his right to a jury and proceed to a bench trial. The defendant's trial counsel filed a motion to waive trial by jury that was not signed by the defendant. The government did not object, and the trial court granted the motion. After being convicted, the defendant contended that without a formal court inquiry he could

7

not have knowingly, intelligently, and voluntarily waived his rights to a jury trial. The Court of Appeals for the Fourth Circuit held that

> although it is undoubtedly the "better practice," neither Rule 23(a) nor the Sixth Amendment requires the district court "to interrogate defendants as to the voluntariness of their waiver of a jury trial. . . ." [citing United States v. Hunt, 413 F.2d 983, 983 (4th Cir. 1969)]. In effect, compliance with Rule 23(a) was sufficient to support the waivers in the absence of evidence that the waivers were not knowing, voluntary and intelligent.

Boynes, 515 F.3d at 286-87.

In Boynes, the Fourth Circuit further held that the existence of "a presumptively valid written waiver, a full hearing on the validity of the waiver in open court, and a judicial finding that the waiver is knowing, intelligent, and voluntary" to be adequate to satisfy Rule 23(a). The Boynes court also cited United States v. Khan, 461 F.3d 477, 491 (4th Cir. 2006), stating:

> [In Kahn] defendants argued that their "jury trial waiver was invalid because the district court did not obtain a written waiver or otherwise conduct a colloquy on the record and determine that their waiver was knowing, voluntary and intelligent." In making that argument defendants primarily relied on United States v. Robertson, 45 F.3d 1423 (10th Cir.1995), and the suggestion of other circuits that a "waiver presented by counsel is inadequate, absent some other showing to satisfy an appellate court that it was actually knowing, voluntary and intelligent." Khan, 461 F.3d at 491-492. This court rejected the argument noting that "in this circuit . . . we have not imposed such a requirement" but instead have held that "while it would be 'better practice' for a district judge to interrogate a defendant who claims through counsel that he wants to waive his jury trial right, nothing in the applicable case law, Rule 23(a) itself, or the Constitution requires it." Id. at 492.

Boynes, 515 F.3d at 287.

In this case, Movant, the government, and the court all consented to a nonjury trial, as required by Rule 23(a). Moreover, Judge Blatt queried Movant regarding his understanding of what a nonjury trial would entail and that Judge Blatt ultimately would make a finding as to Movant's guilt and the sentence to be imposed. Thus, Movant's waiver of his right to a jury trial under Rule

8

23(a) is valid unless trial counsel was ineffective in not informing Movant that Judge Blatt had presided over the change in plea hearings of the government's witnesses.

In United States v. Poole, 640 F.3d 114 (4th Cir. 2011), the defendant, Joseph Poole, went forward with a nonjury trial before a judge who had taken the guilty pleas of two co-defendants. During the bench trial, the trial judge referred a number of times to the pleas of Poole's co-defendants, neither of whom testified at Poole's trial.  On direct appeal, Poole argued that the trial judge had "prejudged" certain elements of the crime and denied Poole his due process right to a fair trial.  The Fourth Circuit assumed, for purposes of appeal, that the trial judge's repeated references to the guilty pleas implicated Poole's constitutional rights.  Id. at 119.  However, the Fourth Circuit noted that appellate courts generally presume a conviction rendered after a bench trial rested only on admissible evidence.  Id. at 120 (citing cases); c.f. Harris v. Rivera, 434 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").  The Fourth Circuit also determined that any error resulting from the Poole judge's references to the guilty pleas was harmless because the evidence against Poole was overwhelming.  Id.

Tracking the Fourth Circuit's analysis, the court will assume for purposes of the § 2255 motion that Movant's constitutional rights were implicated by Judge Blatt's having presided over the guilty pleas of the government's witnesses.  Nevertheless, the court further must assume that Judge Blatt's verdict rested only on admissible evidence.  There is no evidence to the contrary.  It follows that trial counsel was not ineffective for failing to inform Movant of Judge Blatt's involvement with the change of plea hearings.

Further, Movant has not shown that any alleged deficient performance affected the verdict.

9

Movant contends that the evidence against him was based entirely upon the credibility of the witnesses.  Movant asserts that no DNA, fingerprints, or money transfers were associated with him. Movant further contends that the recorded telephone conversations between him and other members of the conspiracy were open to interpretation, and that the interpretations offered by witnesses all depended on the credibility of the cooperating witnesses.  In the court's view, Movant under-represents the evidence against him.

At trial, Johnny Evans, special agent with the South Carolina Law Enforcement Division (SLED), testified that he was called in by the Walterboro police department to assist with using an informant to make controlled purchases of cocaine base from Brothers.  A GPS tracker was affixed to Brothers' vehicle.  The tracking report showed a number of visits by Brothers to a residence that was associated with Movant.  At some point, the federal Drug Enforcement Agency (DEA) became involved and obtained a Title III wiretap for Brothers' phone, which led to the application for a wiretap of Movant's telephones.  Surveillance of Movant's residence disclosed two trips to the residence by Brothers.  ECF No. 1767, 61-71.  In January 2012, Brothers was served a target of investigation letter.  Thereafter, Brothers began to cooperate with law enforcement.

In reviewing the Title III wiretaps and surveillance tapes, Brothers identified at least twelve individuals he had dealings with, including identifying Movant as one of his sources for drugs.  Id. at 82, 84.  On cross-examination, Evans admitted there was no physical evidence of purchases of drugs from Movant.  Id. at 83.  Moreover, two attempts were made to set up controlled buys from Movant, to no avail.  Id. at 87.  The decision was made not to use Brothers to make controlled buys of cocaine or cocaine base from Movant.  According to Evans, people other than law enforcement and Brothers knew of his potential cooperation, which would have put Brothers in jeopardy.  Id. at

93.

Marion Mack next testified for the government.  Mack was  under a federal indictment for drug conspiracy, distribution of five kilograms or more of cocaine, money laundering, a weapons charge, and a marijuana charge.  Mack begin cooperating with the government subject to a proffer agreement and later entered into a plea agreement, both of which mandated Mack be truthful or lose any benefits that had been negotiated on his behalf.  Id. at 103-04.

Mack testified that he was engaged in selling cocaine and marijuana since about 2005 or 2006 up until he was incarcerated in May 2014.   Mack stated that he began purchasing kilos of cocaine in about 2008.  Id. at 100-02.  Mack testified that he was supplying cocaine to an individual named Little Michael.  Little Michael subsequently introduced Mack to Movant in order for Mack to supply Movant with cocaine.  Id. at 107-08.  Mack testified that he and Movant engaged in several drug transactions in 2008.  Id. at 109-14.  Mack stated that he generally left the drug trade from 2009 to 2010.  In 2011 he purchased cocaine from Movant on a number of occasions, but no other transactions took place after 2011.  Id. at 120.

The government next called Norman Robinson to the stand.  Robinson testified he met Movant through his cousin, who told Robinson that Movant had cocaine available for a good price. Id. at 163.  Robinson began purchasing quantities of cocaine base from Movant in 2011.  Robinson testified that he once saw Movant with a kilo of cocaine and cash, and that he had seen Movant make cocaine base.  Robinson also stated that Movant regularly was in possession of a firearm.  Id. at 167-68.  Robinson verified a telephone recording as being a conversation between him and Movant to purchase cocaine.  Robinson explained the coded language they used to discuss a purchase of four and one-half ounces of cocaine for one of Robinson's friends.  Id. at 172-75.

Nathan Rollins of the Berkeley County Sheriff's Department testified that on March 19, 2012, he was asked by the DEA to conduct a traffic stop on a vehicle occupied by Movant. Rollins advised Movant of a warrant and placed him under arrest. During a search incident to arrest, Rollins discovered a clear plastic bag containing a white powder substance, currency, and multiple cell phones on Movant's person. ECF No. 1768, 10-12.

Michael Maxwell, a supervisory special agent for the DEA testified that he was the group supervisor of the Charleston DEA task force on March 19, 2012. He arrived at the scene shortly after Rollins arrested Movant. Id. at 21. Maxwell asked Movant if there were any weapons in the Movant's vehicle, and Movant indicated there was a firearm in the center console. Maxwell secured the firearm, which had a round in the chamber and the hammer in the cocked position. Id. at 22. Maxwell indicated the search of Movant's person revealed approximate six cell phones, a cellophane baggie containing a white powdery substance, a wallet, and approximately $1,900 in cash. Id. at 23. The testimony of Evans, Rollins, and Maxwell was corroborated by testimony from Michael Crumley, currently a polygraph examiner for the Berkeley County Sheriff's Office; and Matthew Simonetti of the Summerville, South Carolina, Police Department and member of the DEA task force.

Helen Creel testified pursuant to a proffer agreement. She stated that she had gone to high school with Movant. Id. at 45. They began seeing each other in May 2011. According to Creel, Movant began supplying her with half a gram to a gram of cocaine every one to two weeks. Id. at 49. Creel testified that she never saw Movant use cocaine, even when they were around other people who were using. Id. at 48. Creel stated that she contacted Movant by phone or text, and that he had approximately four different phone numbers during the six months they were together. Creel also

12

stated that she had seen Movant with a weapon from time to time.  Id. at 50-51.  Creel was working at the solicitor's office in Dorchester County during the period she was involved with Movant.  At his request, she supplied Movant with a copy of an incident report of an ongoing case involving Movant.  She also provided him with information regarding the type of undercover cars that narcotics officers were driving.  Id. at 51-52.

The government next called Jamal McElveen to the stand, who testified pursuant to a plea agreement.  McElveen stated that he began purchasing and transporting kilos of cocaine from Texas to South Carolina in 2008, which continued until he was incarcerated in 2011.  Id. at 59.  McElveen was introduced to Movant in 2010 to see if they could reach an understanding concerning the price of and the purchasing of cocaine.  Id. at 63.  According to McElveen, Movant wanted more cocaine than he could transport from Texas, so they settled on two kilos per trip at $26,000 per kilo.  Id. at 68.  McElveen made four or five trips to obtain kilos of cocaine for Movant, with Movant paying cash up front to McElveen.  Id. at 71.

Steven Chase Mosley testified next pursuant to a plea agreement.  Mosley stated that he started selling drugs the summer of 2009.  He approached Movant about purchasing half an ounce of cocaine for resale in order to make some extra money.  Id. at 99.  He purchased an ounce or two of cocaine every week from 2009 until 2012, when Movant was arrested.  Mosley would mix the cocaine with baking soda for resale or would produce cocaine base.  Mosley testified that Movant kept a firearm in the middle console of his truck.  Id. at 103.  Mosley also identified his and Movant's voices on a number of recordings where they discussed drug transactions and another recording where they discussed money Mosley owed to Movant for cocaine.  Id. at 105-12.

According to Mosley, Movant became aware that Mosley was cooperating with law

enforcement when Movant attended jury selection and heard Mosley's name called as a witness. Movant told Mosley he needed to recant his statements and that Movant had not revealed their drug transactions to law enforcement.  It was decided that Mosley would pretend to be cooperating until the day of trial, when he would change his testimony.  Mosley testified that Movant instructed him to write a letter disclaiming Movant's involvement in selling drugs and stating that he (Mosley) had been pressured into giving information regarding Movant.  Id. at 144.  Out of fear for his and his family's safety, Mosley wrote a letter stating that he had lied and made things up to help himself. Id. at 150-51.

Brothers also testified on behalf of the government.  Brothers stated that he started selling drugs in 2008.  ECF No. 1769, 30.  He began with small quantities but moved up to larger weights of cocaine when he was introduced to Movant around the end of 2008.  Id. at 32-33.  Movant and Brothers stopped dealing together the middle part of 2009, when word got around Brothers was cooperating with law enforcement.  Id. at 33.  Brothers testified that he commenced purchasing cocaine for resale directly from Movant again in March 2010.  Id. at 35, 43.  According to Brothers, he also acted as a middleman on drug deals between Movant and others.  Brothers would purchase nearly every day for himself, and two or three days a week as a middleman between Movant and third parties.  Id. at 38.  Brothers dealt with Movant until January 2012, when he was approached by federal law enforcement.  Id. at 43.

Brothers identified his and Movant's voices on a number of telephone recordings and interpreted their conversations.  Id. at 46-55.  They discussed cash amounts and the purity of the cocaine used by them to make cocaine base.  Brothers eventually received a target letter from law enforcement, and, after informing Movant, did not deal with Movant again.  Id. at 57.  Brothers

14

testified that when he met with law enforcement, he learned they had thousands of wiretap calls between him and others, including Movant.  Brothers decided his choices were to cooperate or go to jail.  Id. at 58.

On June 6, 2013, Brothers was living in Walterboro, South Carolina.  He testified that he took off early from work, had lunch, and went to visit his cousin Tony Bennett's residence.  According to Brothers, he had been with Bennett about thirty or forty minutes when a burgundy Lincoln automobile slowly traveled up a dirt road and past Bennett's residence.  Brothers testified he recognized the car as belonging to Charles Sanders and recognized Sanders driving.  Brothers did not recognize the passenger in the vehicle.  Brothers testified that about five minutes later the passenger came around to the front of residence and started shooting through the screen door.  Id. at 60-63.  Brothers stated that he was transported by emergency personnel to the Medical University of South Carolina, where he underwent surgery to remove bullets from his stomach.  Brothers still has a bullet in his neck that is too close to the spine to remove.  Id. at 66.  In all, Brothers was shot eleven times.  Id. at 68.

The government next called Clifton Brown to testify pursuant to a proffer agreement.  ECF No. 1770 at 10.  Brown testified that he met Movant in a holding cell at the Charleston County, South Carolina, detention center, prior to being transferred to the Georgetown County, South Carolina, detention center.  Brown testified that they became friends while detained in Georgetown.  According to Brown, Movant thought he could prevail in court because there was only one witness testifying against him, and he was caught with only a small bag of cocaine and a registered firearm.  Id. at 11-12.  According to Brown, Movant wished to pay someone to dispose of the witness, and Movant had a cousin who could carry it through.  Id. at 12-14.  One day Movant told Brown that the

15

witness had been shot and was in critical condition.  Id. at 15.

The government called Harris to the stand.  Harris invoked his Fifth Amendment right to be free from self-incrimination and refused to answer any questions propounded by either the government or Movant.  Id. at 27-39.  Judge Blatt determined that Harris was unavailable as a witness pursuant to Fed. R. Evid. 804(a), and thus McElveen and other witnesses would be available to testify as to statements made by Harris that were against his penal interest.  Id. at 49.

McElveen testified that he had a conversation with Harris in which Harris stated he had been paid $10,000 to carry out the shooting of a witness in Colleton County, South Carolina.  Id. at 53.  Harris stated that Movant said he would pay Harris $10,000 to take care of a problem.  The problem was a person named BJ (Brothers) testifying against him.  Id. at 54.  According to McElveen, Harris stated he was put in contact with a person who picked Harris up from the Dorchester Road area, drove him to the Walterboro area and identified BJ, after which Harris got out of the vehicle, was given two weapons, walked up to the door, saw BJ, and shot through the door.  Id. at 55.

Shawn Blount testified pursuant to a plea agreement.  He stated he met Movant in jail where Blount was housed with both Movant and Harris.  While talking about Movant's case, Movant stated he was about to put $10,000 on BJ to have him killed.  Blount testified that he heard Movant tell Harris, who was being released, to handle the BJ situation.  Id. at 85-88.  Blount also testified that Harris returned to jail, and told Blount he had been the one to handle the BJ situation for Movant.  Id. at 90.  Blount's testimony regarding the shooting corroborated McElveen's recitation of what he had been told.  Id. at 92.

The government next called Gernardo Cato, who testified pursuant to a plea agreement.  Cato met Movant as they were being transported from jail to the federal courthouse for hearings.  Id. at

16

109-10.  In discussing his case, Movant made what Cato believed was a joking reference to Brothers, stating "BJ, he want to take his ass out and wondering if Cato knew anyone who could help with that.  Id. at 111.  Later, Cato and Harris were imprisoned at the same facility.  According to Cato, Harris described his dealings with Movant and the facts surrounding the shooting.  These facts also corroborate McElveen's testimony.  Id. at 115-17.

Garrick Sanders ("G. Sanders") next testified pursuant to a plea agreement.  Id. at 132.  G. Sanders testified that on June 6, 2013, Charles Sanders, G. Sander's first cousin, asked G. Sanders to retrieve a bag of guns out of a pickup truck at their grandfather's house.  G. Sanders took the guns to his brother's house and placed them in the garage.  Id. at 140.

Charles Sanders next took the stand.  Id. at 146.  Charles Sanders testified regarding recorded telephone conversations between him and Movant.  According to Charles Sanders, Movant asked him to give someone a lift to show that person Brothers' location.  Id. at 153-58.  Charles Sanders testified that on June 6, 2013, he received a call from Davis giving directions as to where to pick up Harris, whom Charles Sanders had never met before.  Id. at 159-60.  Eventually they ended up at Bennett's residence, where Charles Sanders identified Brothers.  Harris directed Charles Sanders to keep driving, but then had Charles Sanders stop the car and provide Harris with two weapons Charles Sanders had in the car.  Charles Sanders testified that shortly after Harris exited the vehicle he heard gunshots.  Harris returned to the vehicle and they left the scene.  Id. at 162-64.  According to Charles Sanders, G. Sanders called and told Charles Sanders to take the guns to his aunt's house; however, his aunt was in the yard, so Charles Sanders took the guns to his grandfather's house and placed them in the pickup truck.  Id. at 164.  Charles Sanders then took Harris back to Dorchester Road, after which Charles Sanders returned to Walterboro.  Id.  Charles Sanders learned from a

17

number of calls to his cell phone that his name had come up in connection with the shooting. Charles Sanders testified that he was stopped by the police in Cottageville, South Carolina, and taken to the police station, where he denied being involved in the shooting or transporting Harris. Id. at 165-66. The police confiscated Charles Sanders' vehicle and cell phone. Id. at 166.

The government next called Cedrick Myers to the stand. Id. at 174-75. Myers testified pursuant to a plea agreement. Id. at 192. Myers testified that he was introduced to Movant in April 2011. A few weeks later, he traveled to meet Movant to purchase eighteen ounces of cocaine base and half a kilogram of cocaine. Id. at 185. Later he met Movant again to make the same purchase and to see if Movant knew anyone who wanted to sell a gun. Id. at 187. Myers stated he met Movant a third time to make the same purchase, and also purchased a gun from Movant. Id. at 190. Myers was arrested and had no further dealings with Movant. Id. at 191.

The government's next witness was Anthony Davis. ECF No. 1771, 3. He has known Movant since elementary school. Id. at 5. Davis would purchase drugs for third parties from Movant and make a small profit from the transaction. Id. at 7. Davis had a conversation with Movant at the Leeds Avenue detention center at some point. Id. at 12. Davis was told his role was to take an individual to Walterboro to locate Brothers. Id. at 13. Davis eventually picked up Harris, who was carrying a weapon. Id. at 14. Davis got nervous and took Harris to a location Davis knew would be vacant. Harris got frustrated and told Davis to take him back to North Charleston. Id. at 14-15. Ballard subsequently told Davis he would get Charles Sanders to be the driver. Id. at 16. Davis later located Brothers and relayed information in code to Ballard that Brothers had changed his appearance by cutting his hair. Id. at 18-19. On the day of the shooting, Davis called Charles Sanders to pick up Harris. Davis also gave Charles Sanders money for gas. Id. at 19-20. When

18

Davis learned the shooting had taken place, he got nervous and destroyed his cell phone.  Id. at 20-21.  Davis spoke to Movant that evening on Davis's land line as Movant sought information about Brothers' condition.  Id. at 22.

Davis also identified a number of recordings where he would set up a three-way call to allow Movant to converse with an individual in addition to Davis.  Id. at 23-24, 28, 34-37.  Davis testified that, having known Movant since childhood, he understood coded language used in the conversations.  Id. at 26.  Davis also interpreted a number of calls between himself and Movant regarding orchestrating the shooting.  Id. at 28-34.  Davis testified regarding a recording wherein he told Movant that the police had confiscated Charles Sanders' cell phone, as well as another recording that day wherein Movant attempted to discover Brothers' condition.  Id. at 40-41.

Michael Atwood from the Colleton County Sheriff's Office next testified for the government.  Atwood stated he responded to the scene of Brothers' shooting, where he began taking photographs and assisting other officers.  Id. at 59-60.  Brothers was on the ground in front of the residence when Atwood arrived, severely wounded.  Id. at 60-61.  At trial, Atwood identified photographs of the residence, including broken glass at the front door, spent shell casings, a vehicle, blood on he floor of the residence, fired rounds on the floor by the couch, holes in the wall and behind the couch, as well as the ceiling and the front door.  Id. at 61-62.  Atwood also identified photographs of Brothers showing multiple gunshot wounds in Brothers' stomach, legs, chest, and neck.  Id. at 63-65.

Atwood was aided with the execution of a search warrant on Charles Sanders' vehicle.  Id. at 70.  Atwood identified a gunshot residue lift from the passenger side armrest of Charles Sanders' vehicle and a latent fingerprint belonging to Harris.  Id. at 68.  During the search, one cell phone was recovered from the vehicle and two from Charles Sanders' person.  Id. at 69.  Eventually the guns

used by Harris were located and ballistics tests confirmed the weapons matched the ballistics recovered from the scene and from Brothers' body.  Id. at 69-70.  Atwood also identified a still photograph culled from a videotape located near the scene of the shooting.  The photograph, marked June 6 at approximately 4:14 p.m., shows Charles Sanders' vehicle.  Id. at 71.

Special Agent Jacob Kunkle of the Federal Bureau of Investigation took the stand next.  Id. at 73.  Kunkle was offered as an expert on historical cell cite analysis and cell cite phone location.  Id. at 75.  Kunkle testified as to the technology used in tracking cell phones by telephone companies.  Id. at 77-82.  As to days leading up to the shooting, Kunkle identified calls made from Davis's cell phone near the vicinity of the crime on June 4, 2013.  Kunkle also identified calls made by Charles Sanders on June 6, 2013, as he traveled between Cottageville to Roundo, South Carolina, then to North Charleston and  Summerville between 12:48 p.m. and 2:30 p.m.  Id. at 85.  Next, the cell phone data showed Charles Sanders traveling from North Charleston to Summerville between 2:40 p.m. and 3:11 p.m.  Id. at 86.  Kunkle testified that the records next showed G. Sanders' cell phone in the Walterboro area at approximately 4:14 p.m. on June 6, 2013.  According to Kunkle, between 4:20 p.m. and 4:45 p.m., both Charles Sanders' phone and G. Sanders' phone move toward Cottageville.  Id. at 86-87.  Around 4:55 p.m. Charles Sanders' phone moved east toward North Charleston and then returned toward Cottageville.  Id. at 89.

The government's last witness was Special Agent John Schroepfer of the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Id. at 96.  Schroepfer was assigned to review recorded telephone communications made by Movant from the Charleston County Detention Center.  Id. at 98.  During the review, Schroepfer heard Movant referencing other conversations he was having.  Schroepfer testified that he realized Movant was having other conversations that had not been captured.

20

Schroepfer consolidated Movant's most frequently called numbers, and asked personnel at the Charleston County Detention Center to query the specific numbers. Id. at 98. He listened to those recordings and realized Movant was using other inmate identifications to make the calls. Id. Schroepfer identified the various aliases used for the different defendants. Id. at 99. Schroepfer also testified that he was able to authenticate the telephone calls and identify which telephone numbers related to which defendant. Schroepfer also testified regarding a time line setting forth the various telephone calls made on June 6, 2013, starting at 10:12 a.m and ending at 9:29 p.m. Id. at 108-09.

The witnesses were subjected to robust cross-examination by Movant's counsel regarding inconsistencies between their trial testimony and information obtained pursuant to proffer agreements or other sources. The testimony offered by Movant's associates was generally consistent among the associates and corroborated information gathered by law enforcement. Given Movant's counsel's extensive cross-examination, Judge Blatt received a considerable degree of information by which he could determine witnesses' credibility and make a finding of the facts. The court concludes that any deficient performance by Movant's counsel with respect to informing Movant of Judge Blatt's presiding over change of plea hearings of various co-defendants did not prejudice Movant.

For the reasons set out hereinabove, the court concludes that Movant's Grounds One and Two are without merit.

### III.  CONCLUSION

The government's motion to dismiss (ECF No. 1957) is **granted**. Movant's § 2255 motion (ECF No. 1908) is **denied and dismissed**, with prejudice.

21

IV.  CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable.  Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir.2001).  The court concludes that Movant has not made the requisite showing.  Accordingly, the court **denies** a certificate of appealability.

**IT IS SO ORDERED.**


/s/ Margaret B. Seymour
Senior United States District Judge


Columbia, South Carolina

May 5, 2021

22